1  Russell Piccoli (#004492)
   6039 North 41st Place
   Paradise Valley, Arizona 85253
2  Phone: (602) 285-5000
   Fax: (602) 285-5100
3
   Attorney Pro se
4

5

6

7

## UNITED STATES DISTRICT COURT

8

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

9

| RUSSELL PICCOLI, a single man | CASE NO. 08-CV-104 JAH (NLS) |
|---|---|
| Plaintiff, | |
| vs. | **AMENDED COMPLAINT** |
| LIBBY RAUCH, a single woman | |
| Defendant. | |

16       Plaintiff, by way of Complaint, says:

17                          **JURISDICTION AND VENUE**

18       1.     Plaintiff is a resident of Maricopa County, Arizona.

19       2.     Defendant ("Libby") is full-time resident of San Diego, California and, as stated

20  in the following paragraph, a part-time resident of La Paz County, Arizona.

21       3.     This Court has general jurisdiction over Libby because she owns a residence in

22  Arizona and resides in this State part-time, traveling to and residing in her Lake Havasu

23  residence nearly every weekend.

24       4.     This Court has specific jurisdiction over Libby regarding this action because she

25  (a) directed fraudulent representations regarding her financial condition to plaintiff in Arizona

26  upon which he relied to his detriment, and (b) directed false information to plaintiff in Arizona

1 in breach of her fiduciary duty, all as more fully set forth below.

2     5.    Venue is proper in Maricopa County pursuant to A.R.S. §12-401(1).

## THE CONFIDENTIAL RELATIONSHIP

4     6.    Plaintiff met Libby in or about 1994, shortly before Libby's marriage to one of plaintiff's long time, closest friends, David Rauch. Plaintiff served as best man in Libby and Dave's wedding.

7     7.    Following Libby's marriage to Dave, plaintiff and Libby commenced to establish a close personal relationship. Libby and plaintiff's ex-wife became best friends, speaking on a daily basis. The two couples vacationed and spent holidays together and socialized on a nearly daily basis during the summer months. During this period, plaintiff and his ex-wife became godparents to Libby's oldest daughter, Samantha.

12     8.    Following plaintiff's separation from his ex-wife in 1998, plaintiff developed an even closer personal relationship with Libby, which they characterized as a "brother/sister" relationship. During this period, plaintiff also became godfather to Libby's youngest daughter, Abigail.

16     9.    During the years preceding this transaction, the parties continued a close personal relationship, speaking nearly everyday and plaintiff maintaining an extremely active relationship with both of his goddaughters. Libby had use of all plaintiff's residences, and keys to at least two (2) of them.

20     10.    In 2003, plaintiff hired Libby to assist in the interior decorating of a property he was restoring in Laguna Beach, California. Libby did a good job of sourcing and choosing electrical and plumbing materials, surface materials and other items.

23     11.    Thereafter, in 2004, plaintiff employed Libby to oversee the remodeling of another residence he had in Encinitas, California. Although there were a few minor problems, Libby was attentive to her duties and did a more than adequate job in that redevelopment project.

12. During the Encinitas remodeling project, Libby became divorced from David Rauch. Concerned for her future, the parties had many conversations concerning what Libby could do to generate income for the independent support for herself and her daughters.

13. Based upon Libby's hard work and successes in the Laguna Beach decorating and Encinitas remodeling, the parties agreed that Libby might be able to develop a substantial income stream by locating advantageous properties to remodel and overseeing their restoration. Plaintiff agreed to consider assisting Libby in providing financing for such endeavors, on a partnership basis.

## **LIBBY'S REPRESENTATIONS AND AGREEMENT**

14. As a result of the parties' conversations, Libby commenced to locate suitable properties for remodeling in the latter part of 2005. Because this would be Libby's first remodeling project on her own, the parties had discussed locating a property in the range of $500,000.00, with a complete budget under $1,000,000.00.

15. In or about February 2006, Libby advised plaintiff that she had found an excellent remodeling prospect in the Olivenhein area of Encinitas, California ("the property"). Although the property was listed at substantially over $1,000,000.00, Libby indicated to plaintiff that, based upon her research and construction analysis, after remodeling, the property could potentially generate over $500,000.00 in profit to the parties.

16. Over the course of the parties' discussions regarding purchase of the property, they had numerous telephonic conversations as to how the project would work. During the course of those conversations, Libby represented to plaintiff, in Arizona, that:

    (a) She would work virtually full time on the remodeling project to ensure its success;

    (b) She would obtain three (3) bids from subcontractors in each trade, to ensure the project be completed in the most economical fashion; and

1       (c) In the meantime, as Libby had become engaged to another framing contractor who plaintiff did not trust, that Libby's fiancé would not be permitted to do any work on the project unless she obtained three (3) independent bids for any work he would do, and the fiancé was the low bidder.

17. Additionally, because the property had been so much more expensive than that which the parties initially contemplated, plaintiff advised Libby that the maximum he could invest in the project would be $600,000.00. As the purchase and remodeling costs of the property would very likely exceed that amount, plaintiff asked Libby about her financial resources to contribute funds to complete any remodeling over that amount.

18. In response to plaintiff's inquiries, Libby advised plaintiff – in representations directed to plaintiff in Arizona – that she personally had financial resources available to her exceeding $300,000.00, which funds she had obtained from the sale of the marital residence she had with David Rauch, and that her father would contribute any additional funds necessary to permit her to complete the remodeling.

19. As a result of Libby's representations, the parties agreed that plaintiff would contribute up to $600,000.00 for the purchase and remodeling of the property, utilizing his credit to purchase the property and place the property in his name; that Libby would perform all work necessary for the successful remodeling of the property; that Libby would contribute all funds necessary to complete the project beyond the $600,000.00 to be invested by plaintiff, and that the parties would split the profits in the venture equally.

20. To that end, plaintiff prepared a simple hand-written agreement memorializing the four points of the agreement. Because the property would be held in plaintiff's name, providing him protection and because of the confidential relationship between the parties, plaintiff entrusted the agreement, executed by both of them, to Libby for safekeeping.

**LIBBY'S ABUSES AND NON-PERFORMANCE**

21. In early 2006, while the parties negotiated the purchase of the property, plaintiff renegotiated a line of credit to provide for the purchase and remodeling of the property, keeping Libby advised of the timing and charges. Plaintiff completed the purchase of the property pursuant to the parties' agreement in or about May 2006. Libby immediately took possession and ostensibly commenced to prepare plans and obtain permits to start the remodeling project. Plaintiff established a checking account tied to the line of credit to fund the purchase and construction, on which Libby was a signee.

22. Progress was apparently slow during 2006. After obtaining plans and permits, Libby had erred as to the home's connection to public sewer and could not proceed with the remodeling until after that connection was completed.

23. Believing that the residential housing market was soft anyway, plaintiff did not press Libby as to her progress during 2006 and January 2007.

24. However, in February 2007, plaintiff discovered that Libby had given away his vacation home in a charity auction without his knowledge or consent, falsely advising plaintiff that she would be utilizing the home herself with his goddaughters and some of her friends. As a result of this deceit, plaintiff pressed Libby as to the progress of the remodeling project which had now allegedly been ongoing for approximately 8 months.

25. Plaintiff met with Libby at the property in March 2007. Progress was minimal and the remodeling project had been much greater than originally explained by Libby to plaintiff. Although demolition was ostensibly completed, the only construction that had been accomplished was the pouring of some new pads and skeletal framing on a portion of the house. Although plaintiff had requested Libby to bring her records pertaining to the project with her on that date, she allegedly forgot to do so.

26. During the following weeks, the parties had numerous conversations concerning the project. Libby indicated that she had secured multiple bids from subcontractors for work on the project and that work had been progressing quickly.

27. On April 16, plaintiff requested Libby to gather all of her records pertaining to the project and meet him at the property to inspect its progress either later that week or early the following week.

28. The parties met at the property on April 23, 2007. Although a great of additional work had occurred at the property, Libby's records pertaining to the project were a shambles, consisting simply of scores of pieces of paper placed randomly into a file. There were no bids from subcontractors, no check register and no discernable accounting as to what had been expended on the project.

29. More troubling, upon observing that Libby's fiancé's construction company was working on the project, and seeing no bid from the fiancé's company or any other framing contractor, plaintiff asked Libby why the fiancé was working on the property under the circumstances. In response, Libby represented that her fiancé was working on the property at his actual, out of pocket costs, in order to help her "and the girls".

30. Although such made sense as to Libby's half of the profits, plaintiff was quizzical as to how her fiancé would be compensated for work he did benefitting plaintiff. Plaintiff requested Libby to ask her fiancé to call to discuss their arrangements regarding his work. Despite that request, and numerous others, the fiancé never called. Plaintiff also requested, and Libby agreed, to keep daily detailed records of the actual hours her fiancé's employees worked on the project.

31. Additionally, because Libby had maintained no check register or any other record of the checks she had written on the construction account, plaintiff requested that Libby balance the account immediately. She promised to do so.

6

32. Two days later, on April 25, plaintiff received a telephone call from the bank holding the construction account indicating that two (2) checks, collectively exceeding $110,000.00, had been presented to the bank for payment and that there were insufficient funds in the account and the accompanying line of credit to pay both checks.

33. Plaintiff immediately contacted Libby regarding the bounced checks and asked her if she had balanced the account. She indicated that she had not yet had time to do so. During the next several hours, plaintiff made an analysis of the amounts he had advanced on the project, and incorrectly concluded that he had expended about $560,000.00 relating to the project at that time.

34. Understanding that he was obligated to make further mortgage payments on the property until it sold and concerned that Libby might fail to make payments leaving him exposed, plaintiff contacted Libby and advised that he had already invested about $560,000.00 of the $600,000.00 he had agreed to invest. He requested that Libby start making her contributions into the remodeling project at that time – inclusive of covering the bounced check to the lumber company – and that plaintiff would continue to make the monthly mortgage payments until the property sold. Libby acknowledged their original agreement and agreed that plaintiff could retain the additional $40,000.00 as a reserve.

35. Within a day, plaintiff discovered that his housekeeper had been making tax and debt service payments on the property from another account, such that his investment already exceeded $600,000.00. He advised Libby. Libby again acknowledged her obligation to complete financing of the remodel and indicated that she would be paying the bounced check shortly.

36. On April 30, Libby telephoned plaintiff in Arizona indicating that:
    (a) She had thought about their agreement over the weekend and now, five days after having bounced the checks, now recalled that plaintiff had agreed to invest $600,000.00 or $650,000.00 (she couldn't recall which)

for construction expenses and that there had been no agreement regarding his payment of the down payment to purchase the home (over $125,000.00) or the monthly mortgage payments. She indicated that she "assumed" that plaintiff would be reimbursed for all of these amounts, but that there had never been any discussion or agreement as to these investments;

(b) She had little or no money to invest into the project, because she had placed all of her funds in investments with her father, in which they were unavailable to her; and

(c) If plaintiff simply wanted to keep the uncompleted house, he could have it.

37. During the next several days, Libby alternatively claimed she could not locate the written agreement by which the parties had memorialized in their relationship, that there had never been any written agreement, or that she had lost it. She made constant, varying representations of her financial capabilities, ranging from $20,000.00 one day to over $200,000.00 the next. Ultimately, Libby's father advised plaintiff that he would not disclose Libby's financial condition to him and that Libby had no intention of doing so either.

38. In point of fact:

(a) After performing some initial work on the project, Libby essentially abandoned the project to her fiancé, traveling on near continuous vacations to Durango, Colorado, Telluride, Colorado, Hawaii, Texas, Louisiana and every intervening weekend to her new residence in Lake Havasu;

(b) Libby obtained no competitive bids for any subcontractor. Instead, Libby's fiancé simply gave the work to his friends, who charged whatever they pleased;

8

1      (c)    Libby wrote herself checks totaling $34,500 from the construction account, some with no notation and most without any backup.

(d)    Libby's fiancé was not actually performing labor on the property for free. In fact, she had agreed to pay him pursuant to a "bid" (with no competing bids) under which his labor charges were inflated nearly 100% over that which could have been obtained through competitive bidding.

(e)    On April 17, the day following plaintiff's advice to Libby that he would be coming to California to review all of the records, Libby apparently realized the construction line of credit would quickly be exhausted or that plaintiff might cutoff her access to the account. As a result, she simply "cleaned out" the account, running off the remaining $126,330 from the credit line, with checks, to or for the benefit of her fiancé – including $35,000.00 in checks to "Ford Credit", apparently to pay for new vehicles for herself and her fiancé. Libby paid the inflated amounts of her fiancé's bid to him, even though his work was nowhere near complete and was defective.

(f)    Libby embezzled thousands of dollars from the construction checking account and credit card for trips to Las Vegas, including lodging at the Bellagio Hotel, Babies "R" Us, Neiman Marcus, Nordstrom's, groceries, doctors, babysitters and cash, most of, but not all of which, have been returned. Libby treated herself to tickets for her Las Vegas trip from the construction credit card the same day she cleaned out the line of credit by writing $126,879 in check to or for the benefit of her fiancé.

(g)    Much of the work on the project was horrifically defective. For example, her fiancé's electrician had wires strewn all over, had attached a 20 amp line to a 40 amp fuse to service a 50 amp oven, overloaded circuits by

        over one hundred percent and had misaligned the new breaker box with the new power stub out by over nine inches. The electrician's response, in part was "if the inspector catches it we'll correct it". Other work was similarly defective.

(h)   Construction planning was also idiotic. For example, in order to install sprinklers, Libby's fiancé directed the installer simply to assume (and obtain city approval for sprinklers utilizing) a 2-inch water line to the property for purposes of his calculations, although no such line existed and could not be installed without inordinate expense. Because of the magnitude of the false presentation to the city, construction was delayed by nearly two (2) months.

(i)   Libby failed to pay various venders resulting in five (5) liens against the property, aggregating over $150,000.

(j)   As a result of Libby's malfeasance, it took months of effort by plaintiff simply to make corrections necessary to place the property in a position to continue with drywalling and stucco.

### THE SETTLEMENT AND ITS BREACH

39.   As plaintiff came to discover the circumstances set forth in the preceding paragraph, he became increasingly irate and threatened Libby with suit (and her fiancé with a complaint to the California Registrar of Contractors) unless Libby undertook reasonable actions to mitigate the problem.

40.   Plaintiff's aggregation was exacerbated by the fact that Libby continued to take virtually continuous vacations to Lake Havasu, Hawaii, Texas and Louisiana, while these problems persisted and no resolution had been reached.

41.   On June 16, between Libby's vacations to Hawaii and Texas and Louisiana, the parties had numerous discussions concerning a settlement of their dispute without litigation.

1  As a result, the parties agreed that Libby would pay off and obtain releases from three (3)
2  subcontractors and "agree to indemnify Russ from loss on deal". (See Exhibit "A"). Following
3  that agreement, plaintiff faxed a copy of the written terms to Libby after which she again
4  acknowledged her agreement to the terms, but indicated that she was having difficulty in
5  securing her fiancé's agreement to the terms pertaining to him. Later that day, at Libby's
6  request, plaintiff agreed that the settlement would resolve any disputes between them,
7  irrespective of whether her fiancé would agree or not.

8  42.  During the next two days, plaintiff was still without information as to the
9  fiancé's agreement and as to certain aspects of the construction, for which he was attempting
10  to obtain an inspection to move forward with the remodeling. Libby did not answer her cell
11  phone, nor did she return any messages. As a result, on June 18, plaintiff received several text
12  messages from Libby reading in pertinent parts as follows:

> "Russ got your message. Not avoiding any calls, just with family
> that I haven't seen in five years. I agreed to your terms, Simon
> agreed and your message is still threatening. I can't take it.
>
> . . .
>
> We're trying to do everything you ask . . . I am sorry you are dealing
> with this. I will be home next week. I agreed to your terms.

18  43.  Libby's agreement to the settlement terms was further evidenced by a text
19  message to plaintiff on June 26, indicating she had paid two of the subcontractors pursuant to
20  the settlement terms, asking plaintiff "Have you received releases for Inland Truss and Ganahl
21  yet?"

22  44.  As a result of Libby's written confirmation of her agreement to the terms of
23  Exhibit "A", plaintiff withheld suit against Libby and a complaint against her fiancé to the
24  California Registrar of Contractors.

25
26

11

45.     Notwithstanding, Libby has failed to pay at least two of the three subcontractors who she promised to pay and is now denying her agreement to indemnify plaintiff for any loss on the property.

## FIRST CLAIM FOR RELIEF

### (Fraud)

46.     Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

47.     Prior to any investment in the subject property, in February and March 2006, Libby several times represented to plaintiff by telephone, to Arizona, that she had the financial capabilities to fund construction of the remodeling project for all amounts necessary after plaintiff completed his investment of $600,000.00 into the project, and specifically that she had over $300,000.00 available for this purpose from the sale of her marital residence and that her father had promised to assist with any additional amounts necessary.

48.     Upon information and belief, these representations were false and made with knowledge of falsity, based upon Libby's later statements, in April and May of 2007: (a) that she had little or no money to fund construction, and only had amounts between $20,000.00 and $200,000.00 in her savings; (b) that virtually all of her available funds were tied up in investments with her father and inaccessible to her; and (c) that her father had never agreed to assist with any funds, and her father's statement that he had never agreed to invest any funds in the project.

49.     Plaintiff relied upon Libby's representations in purchasing the property in his own name and investing $600,000.00 into the project, as he had a right to do in light of long confidential relationship between the parties.  Libby's representations were material, in that plaintiff would have never made any investment in the remodeling project without sufficient funds from Libby to complete it.

12

50. Plaintiff has been damaged by Libby's false representations in that he has now invested nearly $1,700,000.00 in a half completed house, with no means to complete it.

51. Libby's misrepresentations were made intentionally, with consciousness of the harm they could cause and with the evil mind necessary that a substantial award of punitive damages should be made against her.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duty: Dealings with Fiancé)

52. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

53. As a result of the circumstances set forth in ¶¶ 6-9, plaintiff trusted Libby like a family member, and Libby knew it.

54. By virtue of the long personal relationship between the parties and their partnership as to the remodeling project, Libby had numerous fiduciary duties to plaintiff including those of honesty, information, diligence and to avoid the making of any transaction for her own benefit.

55. On April 23, 2007, when first asked the basis upon which her fiancé was providing labor to the project, Libby represented to plaintiff that he was providing labor at his own, actual cost. In a meeting with Libby's fiancé and another contractor in May 2007, Libby's fiancé made the same representations to plaintiff as to having performed labor on the project at his actual cost.

56. Libby's representation as to her fiancé performing labor at cost was also supported by her file which contained no contract with her fiancé or any bid or estimate for framing labor.

57. However, after obtaining and investigating records of the construction checking account, plaintiff discovered that Libby had written tens of thousands of dollars in checks to or

13

for the benefit of her fiancé during the week of April 16, before overdrafting the account, including two checks to "Ford Credit" totaling $35,000.00.

58. The checks were not accompanied by any time records in Libby's files for the number of employees and time expended by her fiancé's employees, as Libby had promised to keep.

59. Thereafter, plaintiff questioned Libby's fiancé as to his compensation in the absence of any records. At that time, for the first time, Libby's fiancé claimed he had been providing framing services as a "bid job," and about ten days later produced his purported bid allegedly dated January 2007.

60. Although the typical labor charge for residential framing is roughly equal to the cost of lumber, Libby's fiancé's purported bid marked up labor services to nearly 200% of the cost of the lumber, over that which was customary and which could have been obtained had Libby obtained competing bids.

61. On April 17, 2007, Libby paid her fiancé (in checks to him or for his benefit) for more than the amount of his purported bid in full, although his work was nowhere near completed, defective and with no hold back.

62. In fact, on April 17, 2007, apparently with knowledge that such payments would exhaust the construction line of credit, Libby wrote checks to or for the benefit of her fiancé totaling $126,879, over drafting the account the following week. Such wrongful diversion – to overpay for work not complete – depleted available funds necessary to pay suppliers who had already delivered, and an earned progress payment to the roofer, causing over $150,000 in liens against the property.

63. As Libby was living with her fiancé, had comingled their finances and was engaged to marry him at the time, her contract with and payments to her fiancé were in conflict with the partnership's interests and breaches of her fiduciary duties to plaintiff.

64. Libby is liable to plaintiff for all amounts paid to, or for the benefit of, her fiancé.

65. Libby's actions were committed with express knowledge that they were cheating someone who trusted her, wrongful, in breach of her fiduciary duties and with an evil mind such that an award of punitive damages be made against her.

### THIRD CLAIM FOR RELIEF

**(Breach of Fiduciary Duty:  Embezzlement)**

66. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

67. In order to complete the remodeling project, plaintiff established a construction checking account at American National Bank in Colorado, which account was tied to a construction line of credit which plaintiff had established for the project. Libby was made a signer on the account for purposes of the project.

68. Additionally, because some construction expenses are easier to pay by credit card, plaintiff established a construction credit card at Chase Bank and provided Libby a card in her name in order to pay construction expenses.

69. Libby abused both accounts in violation of her fiduciary duties by, without plaintiff's knowledge or permission, (a) directing tens of thousands of dollars in checks and credit card charges for her own benefit including airfares to Las Vegas, charges at the Bellagio Hotel in Las Vegas, for Babies "R" Us, Neiman Marcus, Nordstrom, and her babysitter and (b) writing herself checks totaling $34,500, many without notations, and pocketing yet unknown amounts for herself.

70. Although Libby has repaid some of these amounts to plaintiff, it was not until after plaintiff discovered these defalcations independently and threatened Libby with embezzlement charges.

71. Libby is liable for any amounts not yet repaid, together with interest on all amounts.

72. Libby's embezzlements were made with a consciousness that they constituted theft, cheated someone who trusted her and an evil mind such that punitive damages should be awarded against her.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty: Abandonment of Project)

73. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

74. By virtue of her representations and the partnership relationship, Libby had an express duty to plaintiff to utilize her diligent and best efforts to successfully complete the remodeling project.

75. In direct violation of her obligations, Libby essentially abandoned the project by embarking upon continual vacations during the course of the construction, and essentially "dumping" the project into the control of her fiancé.

76. Libby obtained no competitive bids for any subcontractor, instead leaving it to her fiancé to have his friends perform work on the project at essentially whatever they chose. On average, the lack of any competitive bidding on the project caused the charges to be about 30% higher than what they should have been had competitive bidding been employed.

77. Additionally, much of the work on the project was shoddy. In part:

    a) the electrical work was completely botched, requiring corrective work at a cost of nearly 20% of the original work;

    b) the framing work had not been completed, resulting in nearly a full page of corrections when the house failed inspection, and numerous re-trips to the property to correct the defective work, so the construction could later proceed;

  c) the sprinkler system had been designed and installed based upon a 2-inch water pipe to the property that did not exist and could not have been furnished to the property without tens of thousands of dollars in additional, inordinate expense, alone delaying construction activities for a month and a half; and

  d) various other defalcations by the framers and heating and air conditioning contractors.

78. Libby's defalcations in this regard increased the cost of construction in an amount to be determined at trial.

79. Libby's defalcations were so wanton and reckless and committed with such an evil mind, that an award of punitive damages must be made against her.

## FIFTH CLAIM OF RELIEF

### (Breach of Fiduciary Duty: False Information)

80. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

81. During the months of March and April 2007, Libby directed numerous false statements to plaintiff, in Arizona, regarding the basis upon which her fiancé was working on the project, as to having obtained competitive bids for the project and as to the progress of construction.

82. All of these statements were false and in breach of Libby's fiduciary duties to plaintiff.

83. Moreover, on April 23, 2007, when Libby falsely advised plaintiff that her fiancé was working on the house at his actual, out of pocket cost – and agreed to maintain time records of his employees to make sure any charges were legitimate – she failed to advise plaintiff that she had paid him checks totaling $126,879 (to or for his benefit) six days earlier, and well before his work was completed.

17

84. Libby's false statements to plaintiff during these months caused him not to assume control of the project at an earlier time and prevent financial losses which thereafter occurred.

85. Libby's false statements in this respect were made knowingly and with the intent to deceive plaintiff and with an evil mind sufficient that an award of punitive damages must be made against her.

## SIXTH CLAIM FOR RELIEF

### (Breach of Settlement Agreement)

86. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

87. On or about June 16, 2007, Libby and plaintiff agreed to settle their disputes pursuant to the "settlement terms" set forth on Exhibit A.

88. Libby confirmed her agreement to the settlement terms by two text messages to plaintiff on June 18, 2007.

89. Plaintiff has complied with all of this obligations under the "settlement terms".

90. Libby has breached the settlement terms by refusing to pay Ganahl Lumber Company and Donny Atherton and by denying her obligation to indemnify plaintiff against all loss.

91. Plaintiff is liable in damages to plaintiff for the amounts due and owing to Ganahl Lumber Company, to Donny Atherton and to indemnify plaintiff against any loss on the property.

## SEVENTH CLAIM FOR RELIEF

### (Equitable Indemnity)

92. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

93. Under the circumstances set forth above, equity demands that Libby indemnify plaintiff against any loss on this transaction.

## EIGHTH CLAIM FOR RELIEF

**(Breach of Fiduciary Duty/Constructive Fraud)**

94. Plaintiff repeats each preceding allegation of this complaint as if set forth in their entirety herein.

95. Libby's repudiation of and failure to keep her agreement to invest all sums necessary to complete the project in excess of $600,000, her diversion of funds to herself, her failure to obtain any competitive bids for the project, her diversion of funds to or for the benefit of her then-fiancee (her now husband) and other breaches of fiduciary duty as alleged above, constitute constructive fraud obligating her to compensate plaintiff for any and all losses sustained by him with respect to this project.

WHEREFORE, plaintiff demands:

1) Actual damages in an amount to be established at trial;
2) Punitive damages to be established by the trier of fact;
3) Costs of suit;
4) An award of attorneys' fees; and
5) For whatever further relief the Court may deem proper under the circumstances.

Dated: _____ _____, 2008.

                                    RESPECTFULLY SUBMITTED

                                    By: /s/ Russell Piccoli
                                        Russell Piccoli
                                        rxp@mwmf.com
                                        Attorney Pro se