Charles S. LiMandri, SBN 110841
Sterling J. Stires, SBN 199218
LAW OFFICES OF CHARLES S. LiMandri, APC
P.O. Box 9120
Rancho Santa Fe, California 92067
Telephone: (858) 759-9930
Facsimile: (858) 759-9938

Attorneys for Defendant LIBBY RAUCH

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RUSSELL PICCOLI,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LIBBY RAUCH,<br><br>　　　　Defendant. | Case No.: 08CV00104-JAH-NLS<br><br>**SECOND AMENDED COUNTERCLAIM OF DEFENDANT LIBBY RAUCH**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Magistrate: Hon. Nita L. Stormes<br>Judge: Hon. John A. Houston |

For her Counterclaim against Plaintiff RUSSELL PICCOLI (hereinafter referred to as "PICCOLI" or "Counterdefendant") Counterclaimant LIBBY RAUCH (hereinafter referred to as "RAUCH" or "Counterclaimant"), hereby alleges as follows:

**VENUE AND JURISDICTION**

1. Counterclaimant Libby Rauch lives with her husband, Dave Simon, in Carlsbad, California.

2. Counterdefendant Russell Piccoli is a resident of Paradise Valley, Arizona.

3. This action has been properly removed to the United States District Court pursuant to 28 U.S.C. §§ 1332(a) and 1441, and the parties have stipulated to jointly move this action to the Southern District of California where it would be more properly venued.

///

1

SECOND AMENDED COUNTERCLAIM
CASE NO.: 08CV00104-JAH-NLS

4. This court has jurisdiction over the Counterdefendant as an Arizona resident, and the Southern District of California would also have personal jurisdiction over the Counterdefendant based on his extensive personal and business contacts with that jurisdiction, including his ownership of and business dealings and other actions pertaining to the California residential real properties at issue in this case.

## BACKGROUND OF THE PERSONAL AND BUSINESS RELATIONSHIP BETWEEN THE PARTIES

5. Ms. Rauch met the Counterdefendant through her ex-husband and they have been friends for approximately thirteen years.

6. Ms. Rauch and the Counterdefendant had a close friendship and the Counterdefendant is godfather to her two daughters.

7. In the years leading up to the transaction at issue in this case, Ms. Rauch and the Counterdefendant had such a close relationship that she had free access to stay with her daughters at any of the Counterdefendant's residences.

8. Mr. Simon became acquainted with the Counterdefendant while Mr. Simon was working as a contractor on Counterdefendant's Laguna Beach property approximately four years ago.

## THE JOINT VENTURE TO REMODEL AND SELL CALIFORNIA RESIDENTIAL PROPERTIES

9. In 2003, Ms. Rauch and the Counterdefendant entered into a business arrangement to provide interior design expertise at a residential property in Laguna Beach, California, owned by Counterdefendant.

10. Ms. Rauch and the Counterdefendant orally agreed that the Counterdefendant would purchase the Laguna Beach property and provide construction/remodeling funds, Ms. Rauch would provide interior design expertise for the project, and the Counterdefendant would then sell the property and compensate Ms. Rauch for her time at an hourly rate plus a project-end bonus.

/ / /

/ / /

11. Because of the close friendship between the Counterdefendant and Ms. Rauch, most of the agreements related to the business arrangement and subsequent joint venture, were oral. Some arrangements were made in writing, but were subsequently modified orally.

12. To facilitate Ms. Rauch's interior design and management of the remodeling projects and participation in the joint venture, the Counterdefendant had a line of credit and, checking account, and credit card for Ms. Rauch to use to purchase remodeling and decorating materials and pay subcontractors ("the Construction Account").

13. Because Ms. Rauch and the Counterdefendant had such a close personal relationship, Ms. Rauch would often use the Construction Account for personal expenditures unrelated to the remodeling projects, and would also sometimes use personal funds to pay remodeling expenses.

14. The Counterdefendant also occasionally used the Construction Account for personal expenditures unrelated to the remodeling projects.

15. Ms. Rauch always reimbursed the Counterdefendant for her personal expenditures, or Ms. Rauch and the Counterdefendant orally agreed that her personal expenditures would be offset against her compensation or share of the profits from the joint venture.

16. The Counterdefendant was fully aware of Ms. Rauch's use of the Construction Account for personal expenditures for almost four years, and never raised any concerns with such use until this dispute arose in April 2007.

17. Ms. Rauch has reimbursed the Counterdefendant for any and all personal use of the Construction Account during the four years of their business relationship.

18. Except when the Counterdefendant wanted to discuss her personal expenditures, he did not regularly provide copies of the statements or copies of checks for the Construction Account to Ms. Rauch during any of the remodeling projects. When she did see records of the Construction Account, they were only partial statements and copies of selected checks.

19. Mr. Simon, a licensed contractor in California, was a framing subcontractor for the remodeling of the Laguna Beach property, and informally advised Counterdefendant during the Laguna Beach project.

///

20. When difficulties arose in dealing with the original general contractor for the remodeling of the Laguna Beach property, the Counterdefendant decided that Mr. Simon should step in and serve as general contractor for the remainder of the project, and hired him for that position.

21. The remodeling of the Laguna Beach property was financially successful, and the Counterdefendant compensated Ms. Rauch for time spent for her interior design work as the parties had agreed.

22. Because of the financial success of the remodeling of the Laguna Beach property, Ms. Rauch and the Counterdefendant decided to remodel another residential property.

23. Counterdefendant agreed to have Ms. Rauch manage the remodeling of a residential property - this time a residence in Encinitas, California already owned by the Counterdefendant - but this time when the property was re-appraised after the remodel, Ms. Rauch was to be paid a percentage of the increased value of the home, and was paid an hourly wage.

24. Part of Ms. Rauch's duties, and prior to the remodeling, included locating the Encinitas property for Counterdefendant's purchase.

25. Originally, Ms. Rauch's ex-husband, David Rauch, was a participant in the joint venture regarding the Encinitas property. However, for reasons currently unknown to Ms. Rauch, the Counterdefendant "cut-out" David Rauch from the joint venture agreement.

26. Mr. Simon was indirectly and informally involved in the remodeling of the Encinitas property, occasionally drawing upon his background as a licensed, contractor to advise Ms. Rauch but not otherwise directly participating in the remodeling project.

27. The Counterdefendant chose not to sell the Encinitas property and instead kept it as a vacation home. The Counterdefendant had the Encinitas property re-appraised and Ms. Rauch was paid based on the new appraisal.

28. Throughout the remodeling and sale of the Encinitas property Ms. Rauch continued to occasionally use the Construction Account for personal expenditures unrelated to the joint

///

///

venture, always later reimbursing the Counterdefendant in full for her personal use with his consent or orally agreeing with the Counterdefendant to have her personal expenditures offset against her share of the profits from sale of the property.

## THE COUNTERDEFENDANT FAILS TO FULLY FUND THE OLIVENHAIN PROPERTY PROJECT

29. After two successful projects together, Ms. Rauch and the Counterdefendant decided to continue the joint venture and purchase and remodel another residential property.

30. This time the Counterdefendant expressly insisted that Mr. Simon officially be part of the joint venture and serve as the general contractor, because of his construction expertise.

31. The parties orally agreed that all profits after sale of the new property would be split equally between the Counterdefendant and Ms. Rauch and Mr. Simon as a couple.

32. To facilitate the joint venture, Ms. Rauch went to school for and obtained her California real estate license.

33. Ms. Rauch located a property in the Olivenhain neighborhood of Encinitas, California ("the Olivenhain property") for the joint venture's next remodeling project.

34. Ms. Rauch, Mr. Simon, and the Counterdefendant orally agreed and discussed that the Olivenhain property would have approximately a purchase price of $1.1 million, and that remodeling was expected to require another $650,000.

35. The remodeling cost of $650,000 was based on a construction timeline and budget provided by Mr. Simon - in his capacity as general contractor for the remodeling project and partner in the joint venture - to the Counterdefendant that estimated construction costs at $506,887.20. The $650,000 figure would accommodate any extra construction costs or overages.

36. The parties agreed upon the choice of the Olivenhain property, and the Counterdefendant purchased the Olivenhain property in May 2006.

37. In August 2006, the Counterdefendant selected and hired an architect to draw up plans for the remodeling of the Olivenhain property.

38. On October 24, 2006, the plans were submitted to the City of Encinitas, and the plans were approved in early January 2007.

39. Construction on the remodeling of the Olivenhain property began on January 10, 2007.

40. Ms. Rauch regularly gave the Counterdefendant updates on the progress of construction in January, February, and March of 2007. The Counterdefendant also regularly reviewed construction timelines and job lists submitted to him by Mr. Simon.

**DURING THIS TIME THE COUNTERDEFENDANT DID NOT RAISE ANY CONCERNS ABOUT CONSTRUCTION AT THE OLIVENHAIN PROPERTY TO EITHER MS. RAUCH OR MR. SIMON.**

41. In March 2007, the Counterdefendant visited the Olivenhain property with Ms. Rauch, and told her he was pleased with the progress of construction.

42. In or about late April, 2007, the Counterdefendant again visited the Olivenhain property with Ms. Rauch and indicated he was pleased with the progress of construction.

43. During the April 12, 2007 visit, Ms. Rauch informed the Counterdefendant that several large payments to subcontractors were due on April 16, 2007. The Counterdefendant inquired about the balance of the Construction Account, and Ms. Rauch replied that she did not know because the Counterdefendant was the only one who regularly received bank statements for the Construction Account. The Counterdefendant laughed and said he would call the bank and check the status of the Construction Account.

44. On April 17, 2007, Ms. Rauch wrote several large checks drawn on the Construction Account to pay subcontractors.

45. On April 26, 2007 the Counterdefendant called Ms. Rauch and told her that some of the checks she had written had been returned and that, because he was having financial difficulties, he was unable to contribute the funds he had agreed to provide for the remodeling project. He further informed Ms. Rauch she was going to have to pay the subcontractors and any other remaining costs of the remodeling project.

46. The total amount of the three returned checks was $74,233.11.

47. Upon information and belief, the total amount expended on construction costs to that date - not including the returned checks - was $456,610, far short of the $650,000 amount the

Counterdefendant agreed to provide for construction costs and approximately $50,000 less than the construction budget of $506,887.20 provided to the Counterdefendant by Mr. Simon before the Counterdefendant closed on the purchase of the Olivenhain property.

48. In May 2007, Ms. Rauch used the limited records of the Construction Account she had been provided to investigate the status and statement history of the Construction Account and discovered that the Counterdefendant had never funded it to the $650,000 amount agreed to by the parties to the joint venture.

49. Ms. Rauch discovered that not only had the Counterdefendant paid for the majority of the down payment and many of the regular mortgage payments out of the Construction Account without reimbursement to the Construction Account - in violation of the parties' agreement that only construction or remodeling costs would be paid out of the Construction Account - but also the Counterdefendant had regularly withdrawn significant funds from the Construction Account for his personal use without reimbursing the funds back to the Construction Account.

## **THE COUNTERDEFENDANT'S CAMPAIGN OF HARASSMENT, THREATS, SLANDER AND LIBEL**

50. In late April, Ms. Rauch informed the Counterdefendant that she did not have the funds to complete the remodeling of the Olivenhain property or pay the subcontractors whose checks had been returned.

51. At that time, the Counterdefendant asked if Ms. Rauch could still help him through his financial difficulties by overseeing the remodeling, even if the potential for profiting from the project had been greatly reduced or eliminated.

52. Ms. Rauch agreed to continue to manage the remodeling as a personal favor to the Counterdefendant.

53. Over the next several days, Ms. Rauch and the Counterdefendant had numerous discussions regarding financing options to complete the remodeling of the Olivenhain property, and the Counterdefendant continued to pressure her to advance her or her family's money in place of the amount he had promised but failed to provide.

///

54. On or about May 8, 2007, in conversations with both Ms. Rauch and members of her family, the Counterdefendant began making threats of civil and criminal legal action against Ms. Rauch if she did not contribute funding to the remodeling project or buy the Olivenhain property from him.

55. Subsequent to his initiating threats of legal action in May 2007, the Counterdefendant also expressly barred Ms. Rauch and Mr. Simon from entering the Olivenhain property, to continue overseeing the construction and remodeling or otherwise.

56. The threats to and harassment of Ms. Rauch and her family members continued and escalated throughout May, causing severe emotional distress to Ms. Rauch and other members of her family.

57. In June 2007, the Counterdefendant, an experienced litigator and member of the Arizona bar, prepared and proposed a written settlement agreement for Ms. Rauch and Mr. Simon's signature wherein Ms. Rauch was to not only pay any outstanding amounts owed to subcontractors on the Olivenhain property but also to "indemnify [the Counterdefendant] from loss on the deal" in return for the Counterdefendant not pursuing criminal and civil legal action against her.

58. Despite constant harassment and threats from the Counterdefendant, Ms. Rauch never signed the written settlement agreement, and in June 2007 retained San Diego counsel and ceased direct communications with the Counterdefendant.

59. The Counterdefendant rejected all subsequent offers from Ms. Rauch through her San Diego counsel of settlement or alternative dispute resolution.

60. The three subcontractors whose payment checks were returned filed liens on the Olivenhain property.

61. In oral and written communications to the subcontractors seeking to have them release their liens on the Olivenhain property, the Counterdefendant made numerous allegations that Ms. Rauch defrauded and embezzled money from him, and that her criminal acts resulted in the subcontractors' payment checks being returned for insufficient funds.

///
///

## FIRST CAUSE OF ACTION

### (Breach of Contract)

62. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

63. Ms. Rauch and the Counterdefendant had an oral agreement to purchase, remodel, and sell the Olivenhain property ("the Oral Agreement").

64. Under the terms of the Oral Agreement, Ms. Rauch was to oversee the remodeling and use her California real estate license to sell the Olivenhain property in return for half of the profit realized from its sale.

65. Under the terms of the Oral Agreement, the Counterdefendant was to use his funds to purchase the Olivenhain property and provide $650,000 to the Construction Account to cover the expected $506,887.20 cost of construction plus any overages or additional construction costs.

66. The Counterdefendant did not fully fund the Construction Account as the parties had agreed; in fact only approximately $465,000.00 was allotted for construction, far less than even the $506,887.20 estimated cost.

67. Instead, the Counterdefendant used the Construction Account to make the down payment and mortgage payments for the Olivenhain property, and also for cash advances for his own personal use.

68. The Counterdefendant did not perform his contractual duties under the Oral Agreement or provide sufficient consideration in return for Ms. Rauch's performance under the Oral Agreement.

69. The Counterdefendant's failure to fund the Construction Account and his misuse of the funds he placed into the Construction Account constituted a material breach of the Oral Agreement, causing Ms. Rauch to fail to receive the expected benefit from the Oral Agreement of the sale of the Olivenhain property at a profit, in an amount to be determined at trial. Furthermore, because Counterdefendant's breach of his contractual duties were willful and material such that the Oral Agreement has been rendered unenforceable, and Ms. Rauch is entitled either to the

///

expected profits from the sale of the Olivenhain property or to compensation for her time spent managing and overseeing the remodeling of the Olivenhain property, in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

## SECOND CAUSE OF ACTION

### (Breach of Contract - Breach of the Implied Covenant of Good Faith and Fair Dealing)

70. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

71. The Oral Agreement contained an implied covenant of good faith and fair dealing, requiring that neither party do anything that would prevent the other party from receiving the benefits of the agreement.

72. The Counterdefendant willfully and intentionally failed to fund the Construction Account in the amount of $650,000, as he was required to do under the Oral Agreement.

73. Despite the presence of this implied covenant, the Counterdefendant intentionally failed to perform his contractual duty to fund the remodeling of the Olivenhain property, and expressly barred Ms. Rauch from further performance of her duties under the oral agreement.

74. After willfully and intentionally failing to perform his duties under the Oral Agreement, the Counterdefendant willfully and intentionally barred Ms. Rauch from further performance of her duties under the Oral Agreement, and threatened her with criminal and civil legal action if she did not agree to alter the terms of the Oral Agreement to his benefit.

75. The Counterdefendant was consciously aware that these actions were both in violation of his duties under the Oral Agreement and wrongful and harmful, yet continued to act in the same manner with deliberate disregard to Ms. Rauch's rights under the Oral Agreement.

76. The Counterdefendant's actions were done out of spite and created a substantial risk of tremendous harm to Ms. Rauch such that the Counterdefendant should be found liable for punitive damages, in an amount to be proven at trial.

77. The Counterdefendant's actions in failing to perform under the Oral Agreement, barring Ms. Rauch from further performance under the Oral Agreement, and using threats of legal

///

action to attempt to coerce Ms. Rauch into altering the terms of the Oral Agreement violated the duty of good faith and fair dealing the Counterdefendant owed to Ms. Rauch.

78. Furthermore, the Counterdefendant's breach of the implied covenant of good faith and fair dealing was material and caused Ms. Rauch to fail to receive the expected benefits of the Oral Agreement, damaging her in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court, in addition to punitive damages.

### THIRD CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

79. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

80. After failing to fund the Construction Account such that payment checks to subcontractors were returned, and after Ms. Rauch refused to advance her own or her family's money to pay the subcontractors and finish the remodeling of the Olivenhain property, the Counterdefendant began a campaign of threats and harassment against her and members of her family in order to coerce her into modifying the terms of the Oral Agreement so that she would absorb all the future costs and losses of the remodeling project.

81. This campaign of harassment and threats included regular phone calls to Ms. Rauch, her father, her husband, and her home.

82. In telephone conversations with Ms. Rauch or her family members, and in profane voice mails left on her cell phone and home answering machine, the Counterdefendant repeatedly accused her of criminal activity and threatened to report her to various law enforcement authorities, as well as pursue civil and regulatory action against her and her husband.

83. The campaign of threats and harassment only ceased when Ms. Rauch obtained legal counsel, who instructed the Counterdefendant to direct all communications to counsel instead of Ms. Rauch personally.

84. The Counterdefendant continued to defame Ms. Rauch and her family members to third parties even after commencing this litigation.

///

85. Because of the position of trust the Counterdefendant had with Ms. Rauch as her partner, friend, and godfather to her children, his threats and harassment abused that position of trust, and his attempts to extort contractual concessions from Ms. Rauch constituted outrageous conduct that the Counterdefendant should have realized was nearly certain to cause severe emotional distress to Ms. Rauch.

86. Ms. Rauch has been damaged by the Counterdefendant's outrageous, intentional conduct in an amount to be proven at trial. Furthermore, Ms. Rauch is entitled to punitive damages for Counterdefendant's outrageous, intentional and malicious conduct.

## FOURTH CAUSE OF ACTION
### (Abuse of Process)

87. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

88. The Counterdefendant is willfully using this civil action and has threatened other criminal and/or regulatory action primarily to accomplish the ulterior purpose of forcing Ms. Rauch to alter the terms of the Oral Agreement to his benefit and her detriment. The Counterdefendant is wrongfully attempting to force Ms. Rauch to take all of the risk associated with his personal investment of the Olivenhain, house at a time when the local housing market has taken a large downturn.

89. The Counterdefendant's misuse of the legal process or procedure has caused injury and damages to Ms. Rauch in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

## FIFTH CAUSE OF ACTION
### (Slander)

90. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

91. In numerous conversations with subcontractors holding liens on the Olivenhain property, and possibly with other individuals yet to be discovered, the Counterdefendant has alleged that Ms. Rauch was part of a criminal conspiracy to defraud and embezzle funds from the

Counterdefendant, and that her criminal activity caused the subcontractors not to be paid.

92. These oral communications are known by the Counterdefendant to be false.

93. False, oral communications to a third party that allege criminal activity or dishonest conduct are per se slanderous, and Ms. Rauch can recover general and special damages from the Counterdefendant in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

## SIXTH CAUSE OF ACTION

### (Libel)

94. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

95. In written communications with subcontractors holding liens on the Olivenhain property, the Counterdefendant has expressly stated that Ms. Rauch was part of a criminal conspiracy to defraud and embezzle funds from the Counterdefendant, and that her criminal activity caused the subcontractors not to be paid. There may be other writings of this same nature that are in existence that were authored by the Counterdefendant that Ms. Rauch is unaware of, but may be discovered through litigation of this matter.

96. These written communications are known by the Counterdefendant to be false.

97. False, written communications to a third party that allege criminal or dishonest conduct are per se libelous, and Ms. Rauch can recover general and special damages from the Counterdefendant in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

## SEVENTH CAUSE OF ACTION

### (Breach of Fiduciary Duty to a Partner)

98. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

99. The Counterdefendant was Ms. Rauch's partner in an ongoing joint venture to purchase, remodel, and sell residential real property in southern California, with profits split equally between the Counterdefendant and Ms. Rauch.

100. Partners owe fiduciary duties to one another requiring them to deal with one another in the utmost good faith and to fully disclose to one another all material facts relating to partnership affairs within their knowledge.

101. By failing to fund the Construction Account, by misrepresenting to Ms. Rauch the status of the funding of the Construction Account, by barring Ms. Rauch from continuing performance of her duties under the Oral Agreement, and by threatening Ms. Rauch with criminal and civil legal action in order to coerce her into modifying the terms of the Oral Agreement, the Counterdefendant breached his fiduciary duty to Ms. Rauch.

102. The Counterdefendant's breach of fiduciary duty caused Ms. Rauch to be denied the benefits of the partnership, damaging her in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment)

103. Counterclaimant Rauch incorporates all previous allegations in this Counterclaim as though fully set forth herein.

104. Ms. Rauch managed the remodeling of the Olivenhain property for months, and until Counterdefendant refused to allow Ms. Rauch to finish the project.

105. Ms. Rauch performed these tasks in reliance upon the Oral Agreement with the Counterdefendant that she would share in the profits of the sale of the Olivenhain property once remodeling was completed and the Olivenhain property was sold.

106. The Counterdefendant has now barred her from involvement with the remodeling project, reneged and failed to perform the Oral Agreement, and is continuing to remodel the Olivenhain property independent of Ms. Rauch.

107. The Counterdefendant has benefitted from the hundreds of hours Ms. Rauch spent managing the remodeling project, and owes Ms. Rauch compensation in an amount to be determined at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court.

///

///

**WHEREFORE**, Counterclaimant Rauch demands judgment against the Counterdefendant as follows:

1. For Ms. Rauch's damages in an amount to be proven at trial, but in an amount exceeding the $75,000 jurisdictional limit of this Court;
2. For punitive damages for Counterdefendant's willful, outrageous, intentional and malicious conduct;
3. For Ms. Rauch's costs and reasonable attorneys' fees; and
4. For such other and further relief as this Court deems just and proper under the circumstances.

LAW OFFICES OF CHARLES S. LiMandri, APC

DATED: June 9, 2008    By:    /s/ Charles S. LiMandri
                               CHARLES S. LiMANDRI
                               STERLING J. STIRES
                               Attorneys for Defendant LIBBY RAUCH

**JURY DEMAND:**

TO ALL PARTIES AND COUNSEL OF RECORD, TAKE NOTICE THAT the Defendant, and Counterclaimant, LIBBY RAUCH, hereby demands a trial by jury in this action.

LAW OFFICES OF CHARLES S. LiMANDRI, APC

DATED: June 9, 2008    By:    /s/ Charles S. LiMandri
                               CHARLES S. LiMANDRI
                               STERLING J. STIRES
                               Attorneys for Defendant LIBBY RAUCH

# PROOF OF SERVICE

## Russell Piccoli v. Libby Rauch

*U.S. District Court Case No.: 08cv104 (JAH)(NLS)*

I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action; my business address is P.O. Box 9120, Rancho Santa Fe, California 92067, and that I served the following document(s):

- **SECOND AMENDED COUNTERCLAIM OF DEFENDANT LIBBY RAUCH AND; DEMAND FOR JURY TRIAL.**

on the interested parties in this action by placing a true copy in a sealed envelope, addressed as follows:

Russell Piccoli
410 Neptune Avenue
Encinitas, CA 92024
Tel: (602) 315-3848
E-Mail: rxp@mwmf.com

Russell Piccoli
6039 North 41st Place
Paradise Valley, AZ 85253
Tel: (602) 315-3848
E-Mail: rxp@mwmf.com

■ **BY MAIL - as follows:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Rancho Santa Fe, California in the ordinary course of business. The envelope was sealed and placed for collection and mailing on this date following our ordinary practices. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY FAX - as follows:** I personally sent to the addressee's telecopier number a true copy of the above-described documents. Thereafter I sent a true copy in a sealed envelope addressed and mailed as indicated above.

■ **BY ELECTRONIC MAIL - as follows:** I served a true copy, electronically on designated recipients via electronic transmission of said documents.

I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

Executed on <u>June 10, 2008</u>, at Rancho Santa Fe, California.

Kathy Denworth

1

PROOF OF SERVICE
CASE NO.: 08cv104 (JAH)(NLS)