# DEPOSITION OF LIBBY RAUCH

**San Diego, California**

**May 21, 2008**

**VOLUME I**
**(Pages 1 – 176)**

==================================================

**The Following Pages Are Attached From This Deposition:**

**Deposition Pages:**  5-10, 26, 34-37, 62-71, 115-127, 141-150



UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Russell Piccoli, a single)
man,                      )
                          )
        Plaintiff,        )
                          )
vs.                       )
                          ) Case No. CV07-01844-PHX-SMM
Libby Rauch, a single     )
woman,                    )
                          )
        Defendants.       )
                          )
-------------------------

DEPOSITION OF LIBBY RAUCH

San Diego, California

May 21, 2008

VOLUME I

(Pages 1 - 176)

Reported By:  Christine E. Milkovits,
              CSR NO. 12650

# ecaptions

1106 Second Street #282
Encinitas, CA 92024
858.794.6811
www.ecaptions.com

```
 1              San Diego, California, May 21, 2008

 2                        10:05 a.m.

 3

 4                        LIBBY RAUCH,

 5      having been duly sworn, testified as follows:

 6

 7                        EXAMINATION

 8      BY MR. PICCOLI:

 9          Q.    Let me show you -- I'm not going to slide them

10      because staples might be coming out of the back, but let

11      me show you what we've marked as Exhibit 1 for your

12      deposition, and I'll ask you if you've ever seen that

13      document before.  And take all the time you want to look

14      through it.

15              (Exhibit 1 was marked for identification.)

16              THE WITNESS:  Did we prepare this?

17              MR. LIMANDRI:  No, no.  Arizona counsel did.

18      So you just answer the question.  You may or may not

19      have seen it.

20              THE WITNESS:  I don't know.

21      BY MR. PICCOLI:

22          Q.    This document purports to be an amended answer

23      and counterclaim filed by you on your behalf by Arizona

24      counsel.

25              Did you ever review a draft of such a document
```

1    before it was filed?

2         A.    I don't know.

3         Q.    Do you know what I mean by a draft?

4         A.    Yeah.

5         Q.    Did you authorize the filing of a counterclaim

6    in this action?

7         A.    I'm sure I did.

8         Q.    Do you remember having done so?

9         A.    No.

10        Q.    Did you direct anyone what to say in a

11   counterclaim as to what claims to make -- what factual

12   allegation to make?  Anything of the sort?

13        A.    I'm sure I gave them information.

14        Q.    Okay.  To whom did you give such information?

15        A.    Any questions that were asked of me by Mark.

16              Is that what you're talking about here?

17        Q.    Again, this is your pleading.  I want to know

18   where it came from, you know, what the allegations came

19   from.

20              MR. LIMANDRI:  She just said any questions

21   that Mark -- assuming that Arizona counsel had, she

22   would have answered.  It's not a verified complaint.

23   There's no reason to believe that she saw it or proofed

24   it as to form.

25   ///

1    BY MR. PICCOLI:

2        Q.   Let's -- do you have any idea as to whether

3    the allegations in this document are true or not?

4        A.   I don't know -- even know what allegations

5    you're referring to.

6        Q.   Why don't we go step by step, and why don't

7    you go to page 13, if you could.  If you need to read

8    back to get the context of this, you're more than

9    welcome.

10       A.   What paragraph?

11       Q.   Paragraph 27.  Why don't you read that -- read

12   that paragraph to yourself and tell me if that paragraph

13   is accurate.  And if you need to go back and read more,

14   you know, by all means go back and read it.

15       A.   That's not accurate.

16       Q.   What is -- why don't we do this:  Since you

17   haven't seen this document before, why don't you go back

18   to page 10.  Start at paragraph -- actually, go back to

19   page 9.  Start at paragraph 5 and read all the way

20   through to paragraph 27.

21       A.   Okay.

22       Q.   You can't mark that exhibit though.

23            MR. LIMANDRI:  I can mark my copy.

24   BY MR. PICCOLI:

25       Q.   Actually, you can read your lawyer's copy and

1    mark his up as much as you want.

2                    THE WITNESS:  Inaccurate.

3                    MR. LIMANDRI:  All right.  Make a little note

4    in the margin and we can come back to it.  Keep reading.

5    BY MR. PICCOLI:

6        Q.    Have you had an opportunity to read from

7    paragraphs 5 through 27 of your counterclaim?

8                    MR. LIMANDRI:  She started at nine, I thought.

9                    Did you start at five?

10                   THE WITNESS:  No.  Nine.

11                   MR. PICCOLI:  Fair enough.

12   BY MR. PICCOLI:

13       Q.    And paragraph 27, that is inaccurate, correct?

14       A.    Correct.

15       Q.    There were -- and I assume it's inaccurate to

16   the extent that there were -- there was no continuation

17   of any joint venture when the Olivenhain project

18   started, correct?

19                   Was there an ongoing joint venture between you

20   and Russ regarding anything at the time the Olivenhain

21   project started?

22                   MR. LIMANDRI:  Do you understand the question?

23                   THE WITNESS:  I don't think I understand the

24   question.

25                   MR. LIMANDRI:  What's the problem?  Do you

1    know what a joint venture is?

2              THE WITNESS:  Yeah.

3              So are you saying -- are you asking were we

4    involved in anything else other than --

5    BY MR. PICCOLI:

6         Q.   The Olivenhain property was a new venture,

7    correct?

8         A.   Correct.

9         Q.   And there were other things that may have been

10   done in the past, but it wasn't part of the Olivenhain

11   venture?

12        A.   Correct.

13        Q.   Now, let me go back, if I could.  If you will

14   turn back to paragraph 9, which I think you read, it

15   says in 2003 you and the counterdefendant entered into a

16   business arrangement to purchase and remodel a

17   residential property in Laguna Beach, California.

18             Is that accurate?

19        A.   No.

20        Q.   That never happened, did it?

21        A.   No.

22        Q.   Do you know where that allegation would have

23   come from to get in this counterclaim if it was not

24   accurate?

25        A.   No.

1      Q.   There was -- and in point of fact, there was

2   never a property purchased in Laguna Beach for you to

3   engage in any remodeling, correct?

4      A.   Correct.

5      Q.   And in point of fact, on the property that

6   Russ had in Laguna Beach, you came in near the end of

7   the project to help with picking out surfaces and

8   fixtures, correct?

9      A.   Correct.

10      Q.   On an hourly basis, correct?

11      A.   Correct.

12      Q.   That was the full extent of work you had with

13   regard to that property, correct?

14      A.   Yes.

15      Q.   Paragraph 10 is, likewise, completely

16   inaccurate?

17          Take your time to read it.

18      A.   Correct.

19      Q.   Now, you've had an opportunity to read a few

20   paragraphs.

21          Is this the first time you've ever seen this

22   document sitting here today?

23      A.   Yes.

24          MR. LIMANDRI:  I assume Arizona counsel had

25   her review it, but apparently they didn't.  And my

1          A.    Yes.

2          Q.    And you remember that clearly, that there was

3     an actual meeting at the property?

4          A.    Mm-hmm, yes.

5          Q.    And this is on or about April 12.  If I tell

6     you that the checks were written on April 17, would that

7     give you a better idea as to how many -- as to what the

8     date was of the meeting?  This would seem to indicate

9     five days before -- four or five days before.  Is that

10    your recollection as to the timing of the two events?

11         A.    It could have been.  It was close.

12         Q.    It was close in time, a number of days.

13               And you are certain that it was at the

14    property?

15         A.    Yes.

16         Q.    And you were certain that it was before the

17    checks were written?

18         A.    Yes.

19         Q.    And tell me what else you recall -- tell about

20    the meeting, what time of day it was.

21         A.    It was in the afternoon.  I think you were on

22    your way home from being with Sunny, and you were in

23    town for a board meeting for ProTec, I think it was the

24    next day.  As far as the actual date, I don't know that.

25         Q.    By Sunny you're talking about Sunny Garcia?

1    the laborers to make sure how many hours were actually

2    worked on the project?

3        A.    No.

4        Q.    But in any case, getting back to these

5    paragraphs over here, you're certain you cleared the

6    writing of these checks to or on behalf of Dave Simon

7    with Russ at the property before they were written,

8    correct?

9        A.    Correct.

10       Q.    Let's put a five on this.  This is a copy of

11   Russ's phone bill for the entire month of April 2006.

12   The way the phone bills run -- I don't know how yours

13   work -- it indicates where Russ was on any given day --

14       A.    Mm-hmm.

15       Q.    -- by his phone calls.

16             Can you go to page -- I guess it's 24 of 31

17   and indicate where Russ was on April 12th.

18             (Exhibit 5 was marked for identification.)

19             THE WITNESS:  Page 21?

20   BY MR. PICCOLI:

21       Q.    Page 24 of 31.  They're kind of numbered up in

22   the corner.

23       A.    Arizona.

24       Q.    And not in California anytime during that day,

25   correct?

1     A.     Doesn't look like it.

2     Q.     13th?

3     A.     Arizona.

4     Q.     14th?

5     A.     Arizona.

6     Q.     15th?

7     A.     Arizona.

8     Q.     16th?

9     A.     Arizona.

10    Q.     17th?

11    A.     Arizona.

12    Q.     That's the day the checks were written, right?

13    You wrote the checks on the 17th, did you not?

14    A.     I think so, yes.

15    Q.     You're welcome to turn backwards.  I will tell

16    you that the phone bills indicate Russ was in California

17    on April 8, but that was Easter Sunday.

18           Do you believe you met with Russ at the

19    property on Easter Sunday?

20    A.     No.

21    Q.     You were in Lake Havasu that weekend, were you

22    not?

23    A.     I don't recall.  Easter, yes, I was.

24    Q.     Now, why don't you turn to April 23.  And I'll

25    give you the page number in a second.  And I'll also

1    tell you that Sunny Garcia's phone number is

2    (949) 616-0703.  And you can watch Russ' comings and

3    goings on the 23rd.

4              Does that appear to be the date that you met

5    with Russ at the property, April 23?

6          A.    I don't know.  It shows you're in town.

7          Q.    Shows a trip up to Costa Mesa, which I can

8    tell you is where Sunny Garcia's offices were, and then

9    back again.

10             Does that refresh your recollection that that

11   was the actual date of the meeting, April 23?

12         A.    23?

13         Q.    Yeah.

14         A.    I know that you were coming from, I think,

15   Sunny's or Orange County.  So if that's what this

16   reflects, then --

17         Q.    So it's obvious Russ could not have approved

18   the writing of those checks in advance as you testified,

19   correct?

20             MR. LIMANDRI:  Let me object.  The phone could

21   have been used by someone else.  I'm not saying it was.

22   But this is conclusive evidence of your location.

23   BY MR. PICCOLI:

24         Q.    Let's -- you -- by this time you knew me

25   pretty well, correct?

1        A.    Yeah.  Yes.

2        Q.    Pretty much constantly on the cell phone as

3   far as you knew?  I was always near the phone?  If you

4   called me, I called you back promptly all the time if

5   you didn't reach me right away?

6        A.    Yes.

7        Q.    Did you ever know me to leave the cell phone

8   in one state and travel to another?  Ever see that

9   happen during the 15 years that you knew Russ?

10       A.    No.  But I see you were here on the 7th.

11       Q.    And that was -- and that's the Saturday of

12  Easter weekend.  You told me you were in Lake Havasu

13  then.

14              By the way, do you have Verizon bills too?

15  Are you a Verizon customer or some other --

16       A.    I'm Verizon.

17       Q.    Look at -- your phone bills would indicate

18  your whereabouts on particular days as well, correct?

19       A.    I don't know that.

20       Q.    Do you receive itemized statements each month

21  for your cell phone?

22       A.    No, I don't.

23       Q.    Do you get cell phone bills?

24       A.    No, I don't.

25       Q.    You have a cell phone though, right?

1    telling me I couldn't go on the property.

2         Q.    Well, let's talk about paragraph 54.  It says,

3    The threats to and harassment of Ms. Rauch and her

4    family members continued and escalated throughout May.

5    And since -- in paragraph 52 we talk about May 8th.  I'm

6    guessing that what you're saying there is after May 8th

7    the threats and harassment to you escalated through May.

8              Is that an accurate statement?

9         A.    Well, the threats started before May 8th.

10        Q.    After May 8th through the rest of the month of

11   May, did the threats to and harassment of you and your

12   family members continue and escalate?

13        A.    Yes.

14        Q.    And what were these threats and harassment?

15   What -- how --

16        A.    Horrific -- I'm sorry.  Finish the question.

17        Q.    What are you talking about?  What happened?

18        A.    Horrific voice mails calling, screaming,

19   threatening me, threatening to take everything I have

20   away from me and the girls.  You swearing that you in

21   your heart knew that I never did anything to, you know,

22   try to deceive you in any way or take any of your money,

23   that -- but that you were going to prove to a jury that

24   I'm guilty and numerous badgering phone calls over and

25   over and over.  Calling and threatening -- or calling

1    and talking to other people about what had happened

2    saying incorrect things.

3             I don't know the date that you called my dad

4    -- I don't know that date, but I think it was before

5    May 8 -- threatening him.  Text messages.  I think

6    that's -- nothing in writing.

7        Q.    So this is -- and this happened between May 8

8    and the end of May, the events you're talking about,

9    correct?

10       A.    No.  It happened from the very first phone

11   call, you know, that you placed to me.  I don't know --

12   I know the date.  I have it in my calendar -- up until

13   -- I don't know when it ended.  Maybe after I -- after

14   Jamie got involved.

15       Q.    Well, this talks about -- it says, Over the

16   next several days we had numerous discussions regarding

17   financing options to complete the remodeling of the

18   property and that you were continued to pressure to

19   advance money for the property, correct?

20       A.    That's correct.

21       Q.    When did that occur?

22       A.    I don't know the date.

23       Q.    In point of fact, were there discussions in

24   early May concerning your purchasing the property?

25       A.    There was discussions of purchasing the

1    property.  I don't know about early May, but yes.

2         Q.   And basically -- and there were a number of

3    discussions of how you could afford to purchase the

4    property, correct?

5         A.   Mm-hmm.   Yes.

6         Q.   And your father was going to be involved in

7    helping you purchase the property, correct?

8         A.   Incorrect.

9         Q.   So you never spoke with a mortgage broker and

10   gave information concerning your father to a mortgage

11   broker to have him assist in purchasing the property?

12        A.   No.

13             Yes, I did do that.  But my dad did not want

14   to have any involvement.

15        Q.   You had -- in point of fact, in early May 2007

16   you had at least a half a dozen conversations with a

17   mortgage broker concerning your father's assets, social

18   security number, and other things for him to help you

19   purchase the property.  Correct or incorrect?

20        A.   There was lots of different avenues that we

21   were looking at, and that was one of them.

22        Q.   In fact, you gave the mortgage broker your

23   father's social security number to run a credit check,

24   did you not?

25        A.   No.  I gave him the social security number

1    months prior when I was looking at purchasing my own

2    home with the girls prior to being engaged to

3    Dave Simon.  So CK already had all my father's

4    information.

5         Q.   Do you deny having at least a half a dozen

6    conversations with CK Littlewood in the first week of

7    May regarding your purchase of the property as assisted

8    by your father?  Do you deny that?

9         A.   No.

10        Q.   That happened, right?

11        A.   Right.

12        Q.   And during that same time, did you and Russ

13   discuss Russ coming from California meeting with you,

14   your father, and Dave Simon to work the whole situation

15   out?  Do you recall those discussions ongoing to try to

16   schedule a meeting between the four people?

17        A.   Yes.

18        Q.   And do you recall your father on or about May

19   8 refusing to participate and refusing to meet?

20        A.   I don't know about refusing.  But I know he

21   said he didn't want to be involved with anything that

22   had to do with you.

23        Q.   And actually, he refused to meet, correct?

24        A.   I guess so, yes.

25        Q.   That's what precipitated the conversation from

1    Russ to your father, correct, his refusing to meet and

2    discuss the matter, correct?

3            MR. LIMANDRI:  Objection.  Calls for

4    speculation.  Lacks foundation.

5            THE WITNESS:  I'm not sure.

6    BY MR. PICCOLI:

7        Q.  I want your recollection.  I don't want you to

8    speculate.

9        A.  I said not sure.

10       Q.  And there was a single conversation between

11   Russ and your father, correct?

12       A.  I think so.

13       Q.  And if I tell you that that conversation was

14   on May 8, would it be your testimony, as I think you

15   told me before -- I want to pin it down -- that after

16   that conversation -- and there -- let me step back for a

17   minute.  There was a blowup as a result of that

18   conversation between Russ and your father, correct?

19           MR. LIMANDRI:  Objection.  Lacks foundation.

20   Calls for speculation.

21           THE WITNESS:  I think so.

22   BY MR. PICCOLI:

23       Q.  There was a blowup between you and Russ, and

24   you knew about it, correct?

25       A.  Yes.  You called me.

1       Q.   In fact, you got a text message from Russ that

2   said that unless you want to disclose your actual

3   finances that he was done with you, correct?

4       A.   Yes.

5       Q.   And that was followed by a conversation -- an

6   angry conversation, correct?

7       A.   Yes.

8       Q.   And is it your testimony that following that

9   conversation the threats to and harassment of you and

10  your family members to all these phone calls that you

11  talked about escalated, that that tipped it off?

12      A.   I don't know if it tipped it off.

13      Q.   But after that there were a lot of nasty phone

14  calls, as you testified, correct?

15      A.   Correct.

16      Q.   We have the benefit of phone records, No. 6.

17  Why don't we first go to May 8.  And I'll give you the

18  page.  I'm sorry.  It's page 19 of 29.

19           (Exhibit 6 was marked for identification.)

20           THE WITNESS:  Mm-hmm.

21  BY MR. PICCOLI:

22      Q.   Your father's number is (760) 723-9980.  Is

23  that your father's number?

24      A.   Yes.

25      Q.   Reflects a nine-minute phone call from Russ to

67

1      your father?

2          A.    Where?

3              MR. LIMANDRI:  Five from the bottom, six from

4      the bottom.

5              THE WITNESS:  Okay.  Yeah.  Yes.

6      BY MR. PICCOLI:

7          Q.    And then there's a two-minute phone call with

8      you, looks like immediately thereafter.

9              Do you see that?

10         A.    Yes.

11         Q.    Now, would you point out for me -- and you can

12     go page by page -- point out every phone call you had

13     with Russ after that date.  Just go page by page.  Point

14     out every phone call.

15         A.    And you also did Dave Simon right after.

16         Q.    Let's talk -- you just swore under oath there

17     were all these horrible phone calls.  Just point them

18     out one by one.  Point them out.  Go page by page.  Take

19     your time.

20             MR. LIMANDRI:  Well, don't we have voice

21     mails?

22             THE WITNESS:  Yeah.

23     BY MR. PICCOLI:

24         Q.    And as we know, if you make a phone call and

25     leave a message, that shows up too.  So point them all

1      out.

2          A.    Is this only May?

3          Q.    That's May.   That's when --

4          A.    I'm not attesting to the fact that these dates

5      were correct.   Okay?   There were two weeks after this

6      conversation that you and I didn't speak for at least

7      ten days.

8          Q.    Isn't it true that on May 8 I said I wanted to

9      have nothing to do with you and did not call you again

10     until you called me again on May 31st?   Isn't that the

11     truth?

12         A.    Yeah, that's the truth.

13         Q.    So when you swear under your oath and you put

14     in your counterclaim about all these escalating calls

15     and harassment, that was false, correct?

16         A.    I need your June's.

17             MR. LIMANDRI:   Objection.   Counsel, we have a

18     record of the calls.   For you to say that it's false is

19     outrageous.   Maybe the dates are wrong, but we have a

20     record of the calls.

21             THE WITNESS:   I've never seen this before.

22     Remember?   This is the first time I've seen this.

23     BY MR. PICCOLI:

24         Q.    Your lawyer can advise you of the consequences

25     of filing a pleading without ever having seen it.   I'm

1    not going to get into that.

2              MR. LIMANDRI:   It happens all the time.

3              MR. PICCOLI:   Not in my practice.

4              MR. LIMANDRI:   Read the California Practice

5    Guide.   It's not a verified complaint.   She's not

6    required to see it unless she verifies it.   And Arizona

7    counsel had ten days apparently to get up to speed to do

8    an answer and counterclaim.   We never saw it before it

9    was filed.

10   BY MR. PICCOLI:

11        Q.   Let's get down to what really happened.   There

12   are no phone calls at all from me to you during the

13   month of May.   May 31 you called me.   I call you back.

14   We talk for 29 minutes.   That's our first contact during

15   the month of May.   Correct or not?   You can check the

16   phone bill.

17        A.   I'm sure that's correct since this is all

18   coming back to me now.   Yes, that's right.

19        Q.   After that and as a result of that

20   conversation, I again tell you I'm done with you and I

21   don't want to talk with you again, correct?

22        A.   Incorrect.

23        Q.   We'll get to June -- then let me just follow

24   through -- four days later you send me a letter telling

25   me how much you miss our friendship, correct?

1    A.    Correct.

2    Q.    Then you leave for Hawaii, correct?

3    A.    No.  That was from Hawaii.  That letter was

4    faxed to you when I was in Hawaii.

5    Q.    You called me from Hawaii again apologizing,

6    said that you were having such a miserable time, the

7    girls were having a miserable time because you were

8    miserable, couldn't we work something out.  Correct or

9    incorrect?

10    A.    Correct.

11    Q.    And I said, Listen, have a good time with the

12    girls.  We'll talk when you get back; isn't that

13    correct?

14    A.    Yes.

15    Q.    There was no further contact with you in

16    Hawaii, was there?

17    A.    I don't think so, no.

18    Q.    When you got back -- we'll get to the phone

19    bills in a minute -- we spent almost the whole day going

20    back and forth working out a settlement agreement back

21    and forth over the telephone.  Correct or incorrect?

22    The day you got back from Hawaii.  You get back from

23    Hawaii on a Friday, correct?

24    A.    Don't remember.

25    Q.    But on a Saturday we go back and forth.

1           MR. PICCOLI:  Listen.  Maybe it's something

2    you don't do.  But we have a firmwide policy at our firm

3    for any litigation -- state court, federal court, or

4    whatever -- clients are instructed as part of the fee

5    agreement to preserve all documentation.

6    BY MR. PICCOLI:

7         Q.   But you're telling me from whatever source

8    nobody ever told you you needed to keep papers?

9         A.   (Witness shakes head.)

10        Q.   You need to answer audibly for the court

11   reporter.

12        A.   No.

13        Q.   Let's move on to something else.

14             Now, I think you just told me you never -- you

15   paid the architect by cash; is that --

16        A.   No.

17        Q.   I'm sorry.  You paid the architect by check?

18        A.   Correct.

19        Q.   And so you would have never cashed check,

20   taken the cash, and -- for the architect, correct?

21        A.   Well, at one point there was an agreement to

22   do that, but I don't recall if I went and cashed a check

23   and then -- no, I don't think so.

24        Q.   Let's mark this 15.

25             Now, Exhibit 15 is a check that you did write

1    off the construction account, correct?

2              (Exhibit 15 was marked for identification.)

3              THE WITNESS:  Correct.

4    BY MR. PICCOLI:

5         Q.   And it says architect draw, correct?

6         A.   Correct.

7         Q.   And did you cash -- it looks like you signed

8    the back of it and you cashed it, correct?

9         A.   Correct.

10        Q.   And you did not give the architect the money,

11   correct?

12        A.   Well, I need to look at the dates of Pete's --

13   but I did pay Pete.  I didn't take him the $3,000

14   directly, no.

15        Q.   What did you do with the money?

16        A.   I don't remember.  I don't recall.  Used it

17   for something towards the house.

18        Q.   Well, you have no idea what?

19        A.   (Witness shakes head.)

20        Q.   Taking us back to August of '06, there was --

21   construction hadn't started, correct?

22        A.   Correct.

23             Oh, is that when this was?

24        Q.   August '06 there was nothing going on, was

25   there?

1    A.    Correct.

2    Q.    How could you have spent -- first of all, why

3    did you write down architect draw on -- and let me make

4    sure I'm reading it correctly.  You wrote on the

5    notation of this check architect draw, correct?

6    A.    Correct.

7    Q.    And what you're telling me is you never gave

8    any cash to the architect, so it would not have been for

9    an architect draw, correct?

10   A.    This notation was to -- that I owed -- when --

11   to remind me when I got the bill from the architect that

12   I personally was going to pay this dollar amount to

13   Pete, which is what I did.

14   Q.    You have a $3,000 check that you wrote to the

15   architect?

16   A.    Uh-huh.  And I have a $5,000 check, and I have

17   -- I personally -- out of Libby Rauch's checkbook, I

18   personally wrote Pete Larson checks to cover for this.

19   Q.    Where are these checks?

20   A.    I'll get copies of them from my bank, if you

21   want them.

22   Q.    I don't mean to be -- we requested these

23   things months ago.  You didn't know we requested checks

24   and documents regarding this project?  You didn't know?

25          MR. LIMANDRI:  Well, can't the architect just

1    show he was paid?  I just assume he had --

2            MR. PICCOLI:  The architect tells me he never

3    got a nickel in cash.  That's what the architect says.

4    I've got records over here paid cash, accountings paid

5    cash.  So we're sitting here today --

6            MR. LIMANDRI:  By cash you mean he never got a

7    check at all?

8            MR. PICCOLI:  Never got cash ever.

9            The architect contends he never received cash.

10   That's what the architect contends.

11           MR. LIMANDRI:  By cash you mean he never got a

12   check either?  Cash could be money out of your wallet.

13   I'm assuming she's not paying with actual hard cash.

14   She's saying she gave him a check.

15           MR. PICCOLI:  For purposes of our discussion,

16   when I talk about cash I'm talking about United States

17   bills and notes you go to the store and you pay with.

18   Checks are other instruments.  If I asked about a wire

19   transfer, I'll ask about --

20           MR. LIMANDRI:  I understand.  She's saying she

21   gave him a check.

22   BY MR. PICCOLI:

23       Q.    Was this money deposited into your account?

24   Where did this money go?  Did you keep it in cash?  Did

25   you deposit it into your account?  What did you do with

1    it?

2        A.   I think I deposited it in my checking account.

3        Q.   Now, prior to this project you had never once

4    written a check off the construction account to yourself

5    except to pay yourself, had you?

6        A.   Not sure.

7        Q.   Do you have any check -- and this is something

8    I've asked for, and it's something that's in here.

9    Do you know of any check you ever wrote out to yourself,

10    except that you were permitted to pay yourself, ever?

11        A.   I'm not -- I don't think so.

12        Q.   And you can -- did you ever write out a check

13    with an inaccurate notation on it before?

14        A.   Yes, I'm sure.

15        Q.   You wrote out checks off my account with

16    inaccurate notations?  No.  I'm not talking about your

17    own account.  Did you ever write out a check on any bank

18    account of mine with an inaccurate notation?

19        A.   I don't know.

20        Q.   Do you have any recollection of ever having

21    done so?

22        A.   No.  I never had to review them.  I don't

23    know.

24        Q.   You know that I would have been upset with you

25    writing inaccurate notations on checks from my account,

1    correct?

2        A.    Correct.  I guess, yeah.

3        Q.    Because you knew I wanted to keep things

4    straight for taxes, and I didn't want any kind of false

5    recordkeeping.  You knew that, did you not?

6            MR. LIMANDRI:  Objection.  Calls for

7    speculation.  She said she didn't -- misstates the

8    evidence.

9            THE WITNESS:    I mean, on the Laguna house you

10   would transfer tens of thousands of dollars into my

11   account for me to go withdraw at 9,000 increments to pay

12   cash for your guys to help you tax purposewise.  So I'm

13   not exactly sure why you think it would be different on

14   this job.

15   BY MR. PICCOLI:

16       Q.    Well, you understand what making a false

17   notation on a check is?

18       A.    That was not -- that was an accident.  This

19   was not on purpose.  This was -- architect draw was a

20   notation to myself that I had to reimburse Pete by my

21   personal checking account, which is what I did.

22       Q.    Let's look at -- let's mark this 16.

23            (Exhibit 16 was marked for identification.)

24            THE WITNESS:  That was an inaccurate notation

25   as well.  There's a few of them here that have

120

1    inaccurate notations.

2    BY MR. PICCOLI:

3        Q.   Let's talk about one -- let's talk about them

4    one by one.

5            This is a check you wrote to yourself in July

6    of '06 for $5,000, correct?

7        A.   Correct.

8        Q.   And in your hand you wrote city permits and

9    fees, correct?

10       A.   Correct.

11       Q.   And this check had nothing whatsoever to do

12   with city permits or fees, did it?

13       A.   No.

14       Q.   In fact, you were -- at that stage there

15   weren't even any plans to go to the city, was there?

16       A.   I'm not certain.

17       Q.   Well, you'd hired the architect in -- you

18   hired the architect in -- eight days before.  Did he

19   complete his plans in eight days to go to the city?

20       A.   No.

21       Q.   Was -- he didn't go to the city until October,

22   correct?

23       A.   I'm not sure.

24       Q.   Why don't you go to -- let me see the Bates

25   stamp numbered on it.

121

1          In fact, when you went to the city, you paid

2     the city completely with checks off the construction

3     account, did you not?

4          A.    I'm not sure.

5          Q.    Well, let's see if we could refresh your

6     recollection.

7          MR. PICCOLI:  Do you have your stack of

8     documents, sir?  Actually, I can give her this one.

9     BY MR. PICCOLI:

10         Q.    Go to page -- review pages 17 through 20.

11         A.    What do you want me to review?

12         Q.    Do you have the right pages?

13         A.    Page 117.

14         Q.    No.  I said 17 through 20.  Actually, 16

15    through 20.  I'm sorry.

16         A.    Yes, those were paid to the city.

17         Q.    So the first fees that were paid to the city

18    would have been October 24, '06, some four or five

19    months after this check.  Then there were additional

20    monies paid in February of '07 and then July of '07,

21    correct?

22         A.    Correct.

23         Q.    When you wrote city permits and fees on this

24    $5,000 check, it had nothing to do with the city,

25    correct?

1      A.   Correct.

2      Q.   The notation was false?

3      A.   It was wrong.  It was incorrect.

4      Q.   Well, explain how you wrote city permits and

5  fees -- and you cashed the check?  You kept the money,

6  right?  What did you do with the money?

7      A.   Must have been put in my checking account.

8      Q.   So you write a $5,000 check; you write city

9  permits and fees four months before you ever go to the

10  city; and you keep the money.  Explain the mistake to

11  me.

12      A.   Well, we've done this before.  And this was

13  always -- all the funds you were very well aware of, and

14  that you know anything that's been spent outside and

15  over and above construction costs have all been paid

16  back to you, every single cent.

17      Q.   Please tell me every time since the day I know

18  you that you wrote any check off my account -- first of

19  all with a false notation on it.  Can you identify any

20  time you've ever done that in the past before this deal?

21      A.   No.  I don't know.

22      Q.   Can you identify a single check you ever wrote

23  off of any of my account for your own personal uses

24  ever, ever, ever before this job?

25      A.   Yes.

1     Q.    What?

2     A.    I paid personal stuff from Neptune and paid it

3     back.

4     Q.    With a check?

5     A.    Yeah.

6     Q.    You wrote a check?  Please show me the check.

7           MR. LIMANDRI:  She can't right now.

8           THE WITNESS:  No.  But I will.

9           MR. PICCOLI:  Again, this is why we send out

10    discovery responses.  And we can come back.  You know

11    what?  I think with all the mess we have sitting here,

12    do you guys want some time to properly answer these

13    discovery requests and we'll come back and complete

14    this?

15          MR. LIMANDRI:  I need specific guidance as to

16    what you're looking for.  If you give me specific

17    questions and she believes she has the documents, we'll

18    terminate the deposition and go back and try and get

19    those documents.

20          MR. PICCOLI:  I sent out interrogatories and

21    request production for documents which were explicitly

22    specific as to what I'm looking for.

23          MR. LIMANDRI:  I thought you got responses.

24    But if there's additional documents, we'll have to see

25    if we can find it.

                                                        124

```
 1          MR. PICCOLI:  We get documents provided to us
 2    that are supposedly tied to the interrogatories that the
 3    witness has never seen before.  We're dealing with a
 4    counterclaim that the witness has never seen before.
 5    Listen, maybe -- you know, I've only practiced mostly in
 6    federal court.  If this is the way things are done over
 7    here, it's different.
 8          MR. LIMANDRI:  The counterclaim was done in
 9    Arizona, and it was not verified.  It was done quickly.
10    I can account for that.  As to the discovery requests,
11    we'll be happy to go through and see if there's
12    additional responsive documents and terminate the
13    deposition now, if you want, and then bring whatever
14    additional specific documents so that you can ask
15    questions regarding those.
16          My understanding of what you wanted her to do
17    is, one, go through and corroborate this supplement to
18    the interrogatory responses, which we'll certainly do.
19    She's prepared to do that now.  It will just take some
20    time because we anticipated this and asked her to go
21    through her records meticulously, which I understand
22    she's done to try to match up checks.  But now you're
23    asking another specific question as to whether she's got
24    any copies of any checks from the Neptune job where she
25    paid herself.  And I don't know if that was asked for or
```

1    not.

2            MR. PICCOLI:  It's asked in the -- let me do a

3    couple more things, then we'll break.

4    BY MR. PICCOLI:

5        Q.   Let's talk about this check right here, 17.

6    Again, another copy of a check you wrote to yourself for

7    $3,000 in November of '06.

8            (Exhibit 17 was marked for identification.)

9            THE WITNESS:  Mm-hmm, yes.

10   BY MR. PICCOLI:

11       Q.   Again, another false notation, cash for Mexico

12   doors?

13       A.   No.  I think that when -- I'm not exactly sure

14   when I went and ordered the doors.

15       Q.   Let's see if we can refresh your recollection

16   on that.  Do we have 18 on this one?

17           (Exhibit 18 was marked for identification.)

18           THE WITNESS:  What's the date?

19   BY MR. PICCOLI:

20       Q.   We've got your writing a check to yourself in

21   November of '06, and you go for the doors on March 24,

22   '07.

23           Did you use the cash you had taken to pay for

24   the doors?

25       A.   No.  I think I thought I was going down to

1    Mexico here and didn't, so I wrote two checks -- two

2    separate checks to Bosco.

3         Q.    What did you do with the $3,000?

4         A.    I'm sure I spent it on cash for the house,

5    laborers, or had it in my account.  I don't know.  There

6    was never any concern on my part that you weren't going

7    to be paid back every single dime that -- and you and I

8    had discussed.

9         Q.    So in your mind it was okay to write all the

10   checks you wanted, write whatever you want on the

11   checks, and I was fine with that?  You could write tens

12   of thousands of dollars of checks to yourself with false

13   notations, and I had no problem with that; is that what

14   you legitimately understood?

15        A.    Not tens of thousands of dollars, no.

16        Q.    You know in hindsight you did write tens of

17   thousands of dollars of checks to yourself, correct?

18        A.    Incorrect.

19        Q.    $34,500, does that ring a bell?

20        A.    No.

21        Q.    That's what they total.  Does that surprise

22   you that you wrote that many checks to yourself?

23        A.    You're saying that I wrote $34,000 all cash to

24   Libby?

25        Q.    Yes, all cash to Libby.

1      A.    I don't know.   I wasn't there.

2            MR. LIMANDRI:   The interrogatory response

3   refers to other third parties, not limited to her

4   family.   So to the extent there are other such parties,

5   she may have knowledge of them.

6   BY MR. PICCOLI:

7      Q.    Did I ever make threats to you through third

8   parties, to your knowledge?

9      A.    Yes.

10     Q.    Who?

11     A.    Dave Simon.

12     Q.    Let's get the list of people down first.

13           Anybody else?

14     A.    Jason Adams, Donny Atherton.

15           Now, is this specifically saying that you said

16  one specific thing?

17     Q.    This is threats that I would have communicated

18  to you through a third party.

19     A.    Yes, okay.   So Ganahl Lumber.   There might be

20  more.   I can't think of them right now.

21     Q.    Let's talk about Donny Atherton first.

22           Have you ever spoken directly to

23  Donny Atherton?

24     A.    Never.

25     Q.    So somebody told you -- have you ever met

1    Donny Atherton?

2         A.    I don't know.  I don't recall.  I don't think

3    so.

4         Q.    But it's your contention that I

5    commun- -- that I used Donny Atherton to communicate

6    threats to you, somebody you never met?

7         A.    No, no, no.  You told these people that you --

8    that I had done A, B, and C, and that you were suing me

9    and you were going to take me down.  Is that what this

10   is about?  Or are you asking me if you've threatened

11   specific things?

12        Q.    Let's -- is the sum and substance of what you

13   know that I said to any of these people what you just

14   testified to?  And I can have Christine read your answer

15   back.

16             (Answer read back by the reporter.)

17   BY MR. PICCOLI:

18        Q.    Let's go one by one.

19             Jason, I assume, is an individual you've

20   spoken to, correct?

21        A.    Yes.

22        Q.    And did he ever tell you that I had any

23   conversation with him concerning you?

24        A.    Yes, concerning me and Dave.

25        Q.    What did Jason say that I had said concerning

1    you?

2       A.   That we -- that we together, Dave and I, had

3    had criminal behavior and that we had been in coercion

4    (sic) with one another.

5           MR. LIMANDRI:  Collusion.

6           THE WITNESS:  Or collusion.  Sorry.

7    BY MR. PICCOLI:

8       Q.   Anything else?

9       A.   Yeah.  That you were going to sue us and that

10   you were going to sue him and that he better look for a

11   nice bridge under a freeway somewhere because you're

12   going to take his house away from him.

13      Q.   Anything else?

14      A.   Not that I can recall.

15      Q.   And he said that I said the word criminal

16   behavior?  Did he say --

17      A.   I'm pretty sure, yeah.

18      Q.   What was the collusion or coercion?  Coercion

19   was your word.  Collusion was your counsel's word.  But

20   either way, what did the man tell you?  Let me break it

21   down because obviously he can testify if he wants, but I

22   want your testimony.

23         Did Jason say that I had told him that you

24   were or Dave Simon had coerced anyone to do anything?

25      A.   No.

1    Q.    Did Jason say that you or Dave Simon had

2    colluded with someone to do something?

3    A.    No.

4    Q.    Donny Atherton, you said you've never spoken

5    to the man, correct?

6    A.    Correct.

7    Q.    Did somebody tell you that I had said

8    something to Donny Atherton about you?

9    A.    Yes.

10    Q.    Who told you that I had said something to

11    Donny Atherton?

12    A.    Dave Simon.

13    Q.    What did Dave Simon tell you that

14    Donny Atherton --

15    A.    None of this -- I can't remember word for

16    word.  It was just more of your threats.  You were

17    threatening him telling him that I was taking -- oh, I

18    remember the other thing about Jason -- that I took all

19    your money and went to Hawaii and that you were paying

20    for our vacations and on and on and on.  So just your

21    typical threats.

22    Q.    You had gone to Hawaii, in fact, correct?

23    A.    Correct.

24    Q.    In fact, I talked to Jason when you were in

25    Hawaii, correct?

144

1    A.    Correct.  I faxed you from Hawaii.

2    Q.    And as we just saw, you had taken a good

3    amount of money, correct?

4    A.    Correct.  That's --

5    Q.    So there was nothing untruthful about that,

6    was there?

7    A.    Yes.

8    Q.    Well, I'll let somebody else figure out what

9    was untruthful about that.

10         Donny Atherton, what did Dave Simon tell you

11    Donny Atherton said that I had said about you?  If you

12    don't remember, just tell me.

13    A.    I don't.

14    Q.    Now, Ganahl Lumber -- obviously Ganahl Lumber

15    is not a person.  It's a business.

16    A.    No.  But there was a gal -- I don't even know

17    her name.  I don't remember.

18    Q.    So I had said something -- the gal who you

19    don't know her name, I take it that's a stranger to you?

20    A.    Yes.

21    Q.    So I had said something and you never talked

22    to that person?

23    A.    Correct.

24    Q.    The lady at Ganahl Lumber, you never spoke to

25    her?

1      A.    Correct.

2      Q.    Don't know her; she doesn't know you?

3      A.    Correct.

4      Q.    And you never verified with her what I did or

5  didn't say?

6      A.    No.

7      Q.    And who told you that I had said something to

8  some woman who you don't know who she was at Ganahl

9  Lumber?

10     A.    Dave Simon.  She'd a conversation with

11  Dave Simon.

12     Q.    What did Dave Simon say that I said to the

13  woman about you?

14     A.    I don't recall.

15     Q.    And these are -- just so I'm clear though,

16  it's these conversations with Donny Atherton and

17  somebody who you don't know at Ganahl Lumber that you're

18  suing me for slander in these conversations that you

19  don't know what I'd said?  That's part of your lawsuit

20  against me, correct?

21     A.    Yes.

22     Q.    Now, you said that I had conversations with

23  Dave Simon.

24           What did I supposedly tell Dave Simon about

25  you?

1    A.    You had many, many conversations with

2    Dave Simon. I can't begin -- I don't know. That

3    was --

4    Q.    Well, I'm asking you.

5    A.    He would know.

6    Q.    He would know.

7    A.    And he told me I'm sure, but if I sit

8    here -- I can't repeat word for word.

9    Q.    Can you tell me anything -- do you have any

10   recollection at all of what Dave Simon told you that

11   I -- that I said about you? Any recollection?

12   A.    No.

13   Q.    And in point of fact, whatever I did say about

14   you was of so little consequence to Dave Simon that he

15   still married you, correct?

16   A.    That had nothing to do with me, Russ.

17   Q.    In point of fact, whatever conversations I had

18   with Simon about you would have occurred prior to your

19   marriage to him, correct?

20   A.    Correct. But Simon does not hold your word.

21   That wouldn't have any bearing.

22   Q.    Are there any other conversations that you can

23   tell me about that I ever had with anybody where I

24   supposedly slandered you?

25   A.    I'm sure there are more, and I'll --

1      Q.   Again, you know, this is why today's your day

2   to state your evidence.

3           MR. LIMANDRI:  The letter that you sent to

4   Ganahl Lumber, which you have.

5           MR. PICCOLI:  We'll talk about that, and I

6   appreciate --

7   BY MR. PICCOLI:

8      Q.   Anything else -- anybody else I -- now,

9   slandered means spoke to orally.  Anybody else that you

10  know of that I said anything that was supposedly

11  slanderous to other than what you've just told me?

12     A.   Dave Rauch.

13     Q.   What did I tell to Dave Rauch?

14     A.   I don't know word for word.  I have e-mails

15  from him.

16     Q.   Well, we're going to need those e-mails.

17          Where are those e-mails?

18     A.   I don't know.  I don't even know if I have

19  them.

20     Q.   Again, let me tell you, if nobody else has, in

21  federal court there is an obligation by rule of federal

22  court to preserve all evidence whether it be electronic

23  or in hard copy form.  And there's sanctions from the

24  court that can result.  And if nobody told you that

25  before, I'm telling you that now.  If there's e-mails

1    that supposedly memorialize or establish any of your

2    claims, I want them.  And you have a duty to disclose

3    them under Rule 26.1, and I'm entitled to them.

4         A.   I don't even know if I have them.  So I'll go

5    look for them.

6         Q.   If they've been destroyed then --

7         A.   I don't know if they've been destroyed.  I

8    mean, my computer -- we've moved.  Maybe -- you know,

9    they're not there.  There's definitely one piece of

10   paper that I'm sure you have of an e-mail from him

11   that's in here.

12        Q.   I think I've gotten two e-mails from Davy Boy

13   in my life, and it certainly had nothing to do with you.

14   Be that as it may, if you got it, let's produce it.

15            Anybody else that I supposedly slandered?

16        A.   The concern I have here -- I say these people,

17   and then you're going to be on their ass.

18            MR. LIMANDRI:  That's okay.

19   BY MR. PICCOLI:

20        Q.   That's the way it works.  You're suing me for

21   $2 1/2 million.  That's big dough.  So I'm entitled to

22   talk to these people and find out what really happened.

23            Did you even know that your lawyer claimed

24   damages for $2 1/2 million against me?  Did you know?  I

25   see you smiling, but you have to answer audibly.

1          MR. LIMANDRI:  She said she hadn't seen the

2     counterclaim.  I don't even know if that's the exact

3     amount that's in the counterclaim prepared by Arizona

4     counsel.  And she's not required, I think, to commit

5     herself to a certain amount.

6          MR. PICCOLI:  I'm asking if she knows

7     something.

8     BY MR. PICCOLI:

9          Q.   Do you know that your lawyers disclosed that

10    you -- that you're entitled damages for $2 1/2 million

11    for -- against me for libel and slander?  Do you know

12    that?

13         A.   No.

14         Q.   Nobody ever discussed that with you, I take

15    it?

16         A.   No.

17         Q.   Sure is different over here.

18         MR. LIMANDRI:  Well, Counsel, there's more

19    than libel and slander if we're going to get into the

20    abusive process and extortion.  Yeah, it could be,

21    depending upon your net worth.

22         MR. PICCOLI:  I'll tell you that abuse of

23    process, that's a home run claim you got there, Counsel.

24    That's not going to make --

25         MR. LIMANDRI:  I say the extortion, you know,